IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 3501 LANSDOWNE DRIVE, LEXINGTON, KENTUCKY 40517 | Case No. 5:25-MJ-5325-MAS |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jeremiah Saylor, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application pursuant to Federal Rule of Criminal Procedure 41 for a search warrant to search the premises known as 110 Cynthia Drive, Nicholasville, Kentucky 40356, further described in Attachment A, for the things described in Attachment B.

2.  I am a Special Agent with Internal Revenue Service, Criminal Investigation (IRS-CI), having been duly appointed on December 3, 2023 and, as such, am a Federal Law Enforcement Officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of a federal search warrant. Your affiant's responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), and other financial crimes (Title 18, United States Code).

1

3. I have received extensive training in financial investigative techniques, criminal investigative techniques, criminal law and in the law of search and seizure under the Fourth Amendment, having undergone 27 weeks of training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. During the past year, I have personally conducted and/or participated in numerous criminal investigations, including the execution of multiple search and seizure warrants.

4. Prior to my employment as a Special Agent with IRS-CI, I was employed by the United States Department of State, Bureau of Diplomatic Security Service (DSS), for over 14 years where I spent time as a Special Agent and as an Investigative Analyst. During my time with DSS, I investigated visa and passport crimes, as well as financial related crimes.

5. The facts in this affidavit come from my personal knowledge and observations, my training and experience, information obtained from other agents and witnesses, and review of documents and other evidence. Because this affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, it does not set forth all of my knowledge about this matter.

6. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that Lorena Gallegos willfully underreported income obtained from her two restaurants, Mi Pequena Hacienda Nicholasville and Mi Pequena Hacienda, on both her U.S. Income Tax Return for an S Corporation ("Forms 1120S") and her U.S. Individual Income Tax Return ("Forms 1040") for tax years 2019 through 2023, all in violation of 26 U.S.C § 7206(1). There is also probable cause to search the premises described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of the crimes further described in Attachment B.

## JURISDICTION

7. The investigated offense occurred in the Eastern District of Kentucky. This Court, therefore, has jurisdiction to issue the requested search and seizure warrant because it is "a court of competent jurisdiction," specifically, "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. LORENA GALLEGOS ("GALLEGOS") resides at 4961 Jack's Creek Pike, Lexington, Kentucky 40515 ("SUBJECT LOCATION A"). GALLEGOS is the sole owner of Mi Pequena Hacienda Nicholasville, 110 Cynthia Drive, Nicholasville, Kentucky 40356 ("SUBJECT LOCATION B"), and Mi Pequena Hacienda, 3501 Lansdowne Drive, Lexington, Kentucky 40517 ("SUBJECT LOCATION C"), which are two restaurants that serve Mexican cuisine.

9. GALLEGOS has operated SUBJECT LOCATION B since at least 2008, and SUBJECT LOCATION C since at least 2005.

10. In or around early 2024, GALLEGOS and her husband, Julian Gallegos ("Julian"), listed SUBJECT LOCATION C for sale through broker Steve Pulliam and advisor Justin Ryder ("Ryder") of Bluegrass Business Advisors ("BBA"). The business was listed with an asking price of $1,120,000.00, with reported cash flow of $100,000.00. The asking price included inventory, furniture, and equipment. The stated reason for the sale was their intent to retire.

11. On or about February 6, 2024, an IRS-CI Special Agent trained as an undercover agent ("UCA") spoke with Ryder, who referred to SUBJECT LOCATION C as a "cash cow" for GALLEGOS. Ryder told the UCA that GALLEGOS and Julian purchased property on the coast

3

of Mexico and were building a "huge" house there. Ryder stated GALLEGOS and Julian had done well financially and had "put kids through college" using income from SUBJECT LOCATION C. Later in the conversation, Ryder noted that he asked Julian what his "take home" income was in terms of how profitable the business was, and Julian replied that they renovated their entire house last year using proceeds from SUBJECT LOCATION C. Ryder further commented, to the UCA, that the $100,000 in reported cashflow (as stated in the business listing) did not make sense for the asking price, suggesting GALLEGOS and Julian were likely concealing the true amount of cash they were taking in from SUBJECT LOCATION C out of fear of legal consequences.

12. On or about February 6, 2024, the UCA had a follow-up phone call with Ryder. During the call, Ryder stated that he had spoken with the accountant for GALLEGOS, who informed Ryder that the actual net income from SUBJECT LOCATION C for the year 2023 was $475,000, which significantly differs from the $100,000 in "cash flow" that GALLEGOS and Julian reported to Ryder at the time of the property's listing. Ryder further stated, "what their tax return from 2023 will say is up to them and their CPA and how they figure it, I mean I have no authority there and I don't advise on those types of situations, but my guess is that it would be less than $475,000 that they pay taxes on." Additionally, Ryder stated GALLEGOS was the "business mind" behind the operations, and he dealt with her directly, while Julian was the cook and came up with the menu items.

13. As detailed below, GALLEGOS did not report significant taxable income for tax years 2019 through 2023. SUBJECT LOCATION B and SUBJECT LOCATION C are S corporations, and GALLEGOS is the 100 percent shareholder for both. As such, the businesses are solely owned by GALLEGOS, and their revenues and expenses are passed-through, and

4

reported on GALLEGOS's Form 1040, specifically on the Schedule E, based on information from her Forms 1120S.

14.   IRS records indicate that GALLEGOS and Julian filed as married, filing jointly, on their Forms 1040 for each tax year from 2019 through 2023. They did not claim any dependents during that time. Those returns reported the following relevant information:

| | LORENA and Julian's Forms 1040 | | | | |
|---|---|---|---|---|---|
| s | 2019 | 2020 | 2021 | 2022 | 2023 |
| Wages, Salaries, etc. | $ 204,000.00 | $ 205,023.00 | $ 204,951.00 | $ 204,248.00 | $ 205,007.00 |
| Dividends | 792.00 | 6.00 | 791.00 | | 16,787.00 |
| Capital Gains | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) |
| IRA Distributions | 0.00 | 0.00 | 0.00 | 18,401.00 | 0.00 |
| Other Income | 165,987.00 | (2,674.00) | 248,365.00 | (134,954.00) | (487,964.00) |
| **Total Income** | **$ 367,779.00** | **$ 199,355.00** | **$ 451,107.00** | **$ 84,695.00** | **$ (269,170.00)** |
| Less: Adjustments to Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Adjusted Gross Income | 367,779.00 | 199,355.00 | 451,107.00 | 84,695.00 | (269,170.00) |
| Less: Standard/Itemized Deduction | (62,173.00) | (60,752.00) | (92,757.00) | (39,813.00) | (27,700.00) |
| Less: QBID | (26,676.00) | 0.00 | (49,138.00) | 0.00 | 0.00 |
| **Taxable Income** | **$ 278,930.00** | **$ 138,603.00** | **$ 309,212.00** | **$ 44,882.00** | **$ 0.00** |
| Total Tax | $ 48,447.00 | $ 18,097.00 | $ 62,253.00 | $ 0.00 | $ 0.00 |
| Tax Due/(Refund) | $ (30,489.00) | $ (62,116.00) | $ (19,249.00) | $ (80,912.00) | $ (80,937.00) |

15.   A review of the above-listed Forms 1040 indicated that all wages reported for GALLEGOS and Julian were derived from SUBJECT LOCATION B and SUBJECT LOCATION C.

16.   GALLEGOS and Julian filed Forms 1120S for SUBJECT LOCATION B for each tax year from 2020 through 2023. Those returns reported the following relevant information:

| | HACIENDA NICHOLASVILLE Forms 1120S | | | |
|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 |
| Gross Receipts | $ 2,319,911.00 | $ 3,133,902.00 | $ 3,127,280.00 | $ 3,301,367.00 |
| Returns and Allowances | 0.00 | 0.00 | 0.00 | 0.00 |
| Cost of Goods Sold | (825,607.00) | (1,297,077.00) | (1,309,544.00) | (1,165,440.00) |
| Gross Profit | $ 1,494,304.00 | $ 1,836,825.00 | $ 1,817,736.00 | $ 2,135,927.00 |
| Other Income | 600.00 | 74,476.00 | 0.00 | $ 0.00 |
| Total Income | $ 1,494,904.00 | $ 1,911,301.00 | $ 1,817,736.00 | $ 2,135,927.00 |
| Total Deductions | (1,507,253.00) | (1,738,475.00) | (1,829,574.00) | $(2,145,720.00) |
| **Business Income (Loss)** | **$ (12,349.00)** | **$ 172,826.00** | **$ (11,838.00)** | **$ (9,793.00)** |

17. For tax years 2020 through 2023, GALLEGOS and Julian reported total gross receipts of $11,882,460 for SUBJECT LOCATION B on their filed tax returns. A review of subpoenaed bank records indicates that during that same period, GALLEGOS and Julian received $12,071,508 in credit card sales alone. In addition to the credit card sales, they deposited an additional $569,366 in cash. The total deposits from both credit card and cash sources amounted to $12,640,875, which exceeds the gross receipts reported on their tax returns by $758,415. The discrepancy suggests that GALLEGOS and Julian underreported gross receipts for SUBJECT LOCATION B. A summary of the comparison is listed below:

| | HACIENDA NICHOLASVILLE | | | Tax Information |
|---|---|---|---|---|
| | Chase Subpoena Returns | | | |
| Year | Deposits from Credit Card Sales | Cash Deposits | Total Income | Gross Receipts Per 1120-S |
| 2020 | $ 2,450,247.27 | $ 138,228.75 | $ 2,588,476.02 | $ 2,319,911.00 |
| 2021 | $ 3,222,675.78 | $ 171,251.62 | $ 3,393,927.40 | $ 3,133,902.00 |
| 2022 | $ 3,219,544.52 | $ 145,522.01 | $ 3,365,066.53 | $ 3,127,280.00 |
| 2023 | $ 3,179,041.17 | $ 114,364.41 | $ 3,293,405.58 | $ 3,301,367.00 |
| TOTAL | $ 12,071,508.74 | $ 569,366.79 | $ 12,640,875.53 | $ 11,882,460.00 |

18. GALLEGOS and Julian filed Forms 1120S for SUBJECT LOCATION C for each tax year from 2019 through 2023. Those returns reported the following relevant information:

| HACIENDA LANSDOWNE Forms 1120S | | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| Gross Receipts | $ 2,462,463.00 | $ 2,029,697.00 | $ 2,514,835.00 | $ 2,799,157.00 | $ 3,159,501.00 |
| Returns and Allowances | (4,388.00) | (3,188.00) | 0.00 | 0.00 | 0.00 |
| Cost of Goods Sold | (817,863.00) | (699,445.00) | (756,547.00) | (987,849.00) | (1,153,541.00) |
| Gross Profit | $ 1,640,212.00 | $ 1,327,064.00 | $ 1,758,288.00 | $ 1,811,308.00 | $ 2,005,960.00 |
| Other Income | 2,474.00 | 600.00 | 600.00 | 0.00 | 0.00 |
| Total Income | $ 1,642,686.00 | $ 1,327,664.00 | $ 1,758,888.00 | $ 1,811,308.00 | $ 2,005,960.00 |
| Total Deductions | (1,475,168.00) | (1,260,801.00) | (1,624,201.00) | (1,854,247.00) | (2,379,461.00) |
| Business Income (Loss) | $ 167,518.00 | $ 66,863.00 | $ 134,687.00 | $ (42,939.00) | $ (373,501.00) |

19. For tax years 2019 through 2023, GALLEGOS and Julian reported total gross receipts of $12,965,653 for SUBJECT LOCATION C on their filed tax returns. A review of

6

subpoenaed bank records indicates that during that same period, GALLEGOS and Julian received $13,707,063 in credit card sales alone. In addition to the credit card sales, they deposited an additional $855,173 in cash. The total deposits from both credit card and cash sources amounted to $14,562,236, which exceeds the gross receipts reported on their tax returns by $1,596,583. The discrepancy suggests that GALLEGOS and Julian underreported gross receipts for SUBJECT LOCATION C. A summary of the comparison is listed below:

| HACIENDA LANSDOWNE | | | | |
| --- | --- | --- | --- | --- |
| | Chase Subpoena Returns | | | Tax Information |
| Year | Deposits from Credit Card Sales | Cash Deposits | Total Income | Gross Receipts Per 1120-S |
| 2019 | $ 2,494,627.06 | $ 261,655.73 | $ 2,756,282.79 | $ 2,462,463.00 |
| 2020 | $ 2,326,383.38 | $ 132,637.62 | $ 2,459,021.00 | $ 2,029,697.00 |
| 2021 | $ 2,864,452.00 | $ 173,943.00 | $ 3,038,395.00 | $ 2,514,835.00 |
| 2022 | $ 3,035,237.89 | $ 119,461.00 | $ 3,154,698.89 | $ 2,799,157.00 |
| 2023 | $ 2,986,363.09 | $ 167,476.00 | $ 3,153,839.09 | $ 3,159,501.00 |
| TOTAL | $ 13,707,063.42 | $ 855,173.35 | $ 14,562,236.77 | $ 12,965,653.00 |

20. A comparison of the financial summaries for both SUBJECT LOCATION B and SUBJECT LOCATION C show the total amount of unreported gross receipts is $2,354,999 for tax years 2019 through 2023.

21. In October 2024, IRS-CI SAs visited SUBJECT LOCATION C to eat lunch. When the bills arrived, two agents paid with credit cards and one agent paid with cash. The agents observed the server process the credit card payments at one point-of-sale (POS) system and then process the cash payment at a separate kiosk. In this instance, the cash transaction was processed differently than the credit card transactions.

22. On July 7, 2025, IRS-CI SAs visited SUBJECT LOCATION B to eat lunch. The waitstaff took the agents' orders and typed them into a wall-mounted Toast device. Shortly after, the waitress brought out the agent's food from the kitchen. When the bills arrived, one agent paid with a credit card and one agent paid with cash. The agents observed the server process the

credit card payments at a Toast POS system and then process the cash payment at a separate kiosk. Also in this instance, the cash transaction was processed differently than the credit card transaction. The agents all received printed receipts for their payment transactions. It appeared the receipts were generated from the same Toast device and then printed. It should be noted that the agent that paid with a credit card received a different kind of receipt than the agent who paid with cash. While at SUBJECT LOCATION B, agents noticed five iPads throughout the restaurant – one was on top of a cash box, one was close to the front door, two were close to the patio and the other was by the restrooms. The agents believed all the iPad devices were used by the servers to process credit card payments and close out tickets using the Toast system.

23. Based on subsequent analysis of bank records, agents determined that the payments at SUBJECT LOCATION B were being processed through a system called Toast. Toast is an electronic POS platform commonly used in the restaurant industry to manage sales, track orders, and process transactions. It operates through iPads or similar touchscreen devices and connects directly to the business's financial accounts. The use of Toast helps establish how electronic sales data is recorded and may assist in determining whether all transactions were properly recorded for tax purposes.

24. In order to prove violations of Internal Revenue Laws, it is critical to establish the individual's true income, ownership of assets and that they willfully violated the Internal Revenue Law.

25. Individuals generally maintain various financial records, such as journals, ledgers, bank statements, check registers, deposit slips, payroll records, records documenting the receipt and disbursement of funds, and records showing ownership or control of assets. Such records are critical in establishing an individual's true income as well as true ownership of assets.

26. In order to prove that the individual committed the act willfully it is necessary to obtain documents which will prove the individual voluntarily and intentionally violated their known legal duty of filing a true and accurate Form 1040. Based on my training and experience, I know that individuals generally maintain either formal or informal notes, ledgers, communications, records documenting the receipt and disbursement of funds, and records showing ownership and control of assets all of which are necessary in proving the individual willfully filed a false Form 1040.

27. Based on a review of subpoenaed records from JPMorgan Chase Bank ("Chase"), SUBJECT LOCATION A is the mailing address on file for GALLEGOS and Julian. Chase mails financial statements to SUBJECT LOCATION A for GALLEGOS and Julian's personal accounts, as well as for accounts associated with SUBJECT LOCATION B and SUBJECT LOCATION C.

28. Based on a review of IRS records, SUBJECT LOCATION A was listed as the "home address" on GALLEGOS and Julian's Forms 1040 for tax years 2018 through 2023.

29. Based on my training and experience, individuals who manage and operate business activities commonly maintain records and documentation related to those businesses at their personal residence and individuals typically retain financial and business records for extended periods of time due to their personal and business tax obligations.

30. It is common for most individuals to have at least one computer, such as a desktop, laptop, or other type of computer, within their household that is used to send emails, access the internet, make and store records of purchases, create and submit tax returns, store personal information, such as pictures, financial information, phone/address list, and/or other

personal information. According to subpoenaed bank records, GALLEGOS used an electronic device to make online bank transfers and to submit payments.

31. In order to determine if GALLEGOS underreported gross receipts for SUBJECT LOCATION B and SUBJECT LOCATION C, it may be necessary to use an indirect method of proof, such as a net worth analysis to determine GALLEGOS's true tax liability. In a potential net worth tax investigation, it is necessary to document any and all expenditures made by a target of an investigation during the years under investigation. It is also critical to determine GALLEGOS's "Cash on Hand" in calculating a potential criminal tax liability, especially in circumstances involving skimming cash off the businesses' books. It is necessary to search SUBJECT LOCATION A, SUBJECT LOCATION B and SUBJECT LOCATION C to identify the skimmed cash via a cash hoard to determine the Cash on Hand, as well as document any and all expenditures and improvements made to the properties.

32. Based on my training and experience, individuals engaged in an income-producing activity normally maintain financial records, income tax records, property records, and business records at their places of business. Financial, property, and business records are also maintained on computers, discs, flash drives, DVD drives, detachable drives, and other electronic devices that store data and are maintained at businesses.

33. Based on my training and experience, owners and operators of businesses maintain records including invoices, cash receipts journals, loan records, notes, ledgers, bank records, blank forms, contracts, receipts, copies of cashier's checks, copies of money orders, customer lists, and other financial instruments.  Business records including books, ledgers, copies of checks, and employee information are maintained where they are most readily accessible, usually on the business.

34. Based on my training and experience, business owners often use computers to record business information and generate business documents including sales data, accounting information, inventory reports, customer lists and the like.

**Electronic Devices**

35. As described in Attachment B, this application seeks permission to search for records that might be found at Subject Location A, B, or C, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic devices and storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36. I submit that if a computer or storage medium is found at Subject Location A, B, or C that there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

  a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being

11

  used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37. In most cases, a thorough search of a premises for information that might be stored on electronic devices or storage media often requires the seizure of the physical device/storage media and later off-site review consistent with the warrant. In lieu of removing the device/storage media from the premises, it is sometimes possible to make an image copy of device/storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the device/storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

 e. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Electronic devices and storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

 f. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the device/storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

 g. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

38. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

13

electronic devices and storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## Conclusion

39.     Based on the foregoing, the undersigned respectfully submits that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 26, United States Code, Sections 7206(1) (Fraudulent and False statements related to federal income tax return) as described in Attachment B to this application, are presently located within Subject Location A, B, and C. The undersigned therefore respectfully requests that the attached warrant be issued authorizing a search and seizure for the items listed in Attachment B within the Subject Locations A, B, and C to include structures and on any electronic storage media therein, more particularly described in Attachment A-1, A-2, and A-3 to this application.

## Request for Sealing

40.     I Further request that the Court order that all paper in support of this application, including the affidavit and the search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving

targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

/s/ Jeremiah Saylor
Jeremiah Saylor
Special Agent, IRS-CI

Subscribed and sworn to me by telephone, pursuant to FRCrP 4.1, on July 29 , 2025.

_____
JUDGE MATTHEW STINNETT
UNITED STATES MAGISTRATE JUDGE